607 A.2d 1281

THE REUBEN H. DONNELLEY CORPORATION, PLAINTIFF–
RESPONDENT, v. DIRECTOR, DIVISION OF TAXATION,
DEFENDANT–APPELLANT.

Argued March 2, 1992—Decided June 22, 1992.

*Joseph L. Yannotti,* Assistant Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Margaret A. Holland,* Deputy Attorney General, on the briefs).

*Jerome R. Hellerstein,* a member of the New York bar, argued the cause for respondent (*Stryker, Tams & Dill,* attorneys; *Charles M. Costenbader,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents the issue of whether a corporation may include safe-harbor-lease (SHL) property in the property fraction used to determine its business-allocation factor under the New Jersey Corporation Business Tax Act (the CBT Act) for the tax years 1983 and 1984. We conclude that it may not.

## I

In 1981, Congress enacted the Economic Recovery Tax Act (ERTA), which granted additional depreciation under the Accelerated Cost Recovery System (ACRS) and tax credits for the purchase and leasing of certain machinery and other equipment. *I.R.C.* § 168(f)(8) (1981). Congress recognized that some companies that wished to purchase new equipment might not be able to take advantage of the tax benefits. That would be the case if the company had lost money or paid no taxes that year. As the Senate Finance Committee reported:

> [We] recognize that some businesses may not be able to use completely the increased cost recovery allowance and the increased investment credits * * * [they] will provide the greatest benefit to the economy if * * * deductions and investment tax credits are more easily distributed throughout the corporate sector.

[*S.Rep.* No. 144, 97th Cong., 1st Sess. 61 (1981) U.S.Code Cong. & Admin.News 1981, pp. 105, 166.]

To achieve the distribution of those tax benefits Congress permitted businesses to enter into safe-harbor leases. Those

safe-harbor leases permitted a company needing equipment to buy and then sell the equipment to another company that could use the tax benefits. The second company would then lease the equipment back to the first. The safe-harbor lease was a net lease: the company employing the equipment loaned the funds to the second company for the "purchase," and in lieu of paying rent, reduced this debt on a regular basis. Usually the two companies exchanged no money except for the down payment.

The transaction took place solely on paper. The buyer-lessor entered into a safe-harbor lease solely to take advantage of its tax benefits. Prior to ERTA, the Internal Revenue Service (IRS) scrutinized leases to determine the underlying economic substance of the transactions. The IRS considered whether the lessor derived a profit or cash flow from the transaction itself or solely from the tax benefits of ownership, and whether the lessor held the burdens, benefits, and incidents of ownership.

In contrast, under ERTA, as long as the parties used the appropriate *form* for the transaction, that the lease had no economic substance aside from federal tax benefits was irrelevant. ERTA made actual ownership of the property unnecessary for federal tax purposes. The only requirement was that "all of the parties to the agreement characterize such an agreement as a lease and elect to have the provisions * * * apply." *I.R.C.* § 168(f)(8)(A). If the parties entered into a safe-harbor lease, "the lessor [would] be treated as the owner of the property." *I.R.C.* § 168(f)(8).

## II

The taxpayer, The Reuben H. Donnelley Corporation (Donnelley), is a Delaware corporation that does business both within and outside New Jersey. In 1981, Donnelley entered into a number of equipment leases with several manufacturing companies that qualified as safe-harbor leases pursuant to *I.R.C.* § 168(f)(8). The lease transactions fully comported with ERTA and were entered into solely for federal-tax purposes. As a

result of those transactions, Donnelley became the nominal owner-lessor of a large amount of property located outside New Jersey. Other than tax benefits, it did not receive any incidences of property ownership.

Although its ownership was for federal-tax purposes only, Donnelley included its SHL property in the property fraction used to calculate its New Jersey Corporation Business Tax (CBT) for the tax years 1981, 1983, and 1984. In auditing the corporation, the Director of the Division of Taxation (Director) allowed Donnelley to include its SHL property in its property fraction for the tax year 1981 but excluded it for the tax years 1983 and 1984. Those exclusions are at issue.

Donnelley filed a complaint in the Tax Court challenging the exclusion of the SHL property from the property fraction. In its complaint it also alleged that rental payments from the SHL property were includable in the receipts fraction, also used to calculate its CBT liability. It no longer takes that position.

The Tax Court upheld the Director's decision, finding that the 1982 amendments to the CBT Act reflected the Legislature's intent to uncouple state– and federal-tax treatment of safe-harbor leases. Although Congress allowed the form of those leases to govern their tax treatment, the New Jersey Legislature has always followed a policy that true ownership determines whether a corporation may include property in its allocation fraction. The 1982 amendments to the CBT reinforced that policy with respect to SHL property. The Tax Court therefore concluded that Donnelley, as a nominal owner of SHL property, could not include such property in its property fraction.

Moreover, the Tax Court found that the 1982 amendments specifically dictated that the Director exclude the SHL property. 11 *N.J.Tax* 241. Accordingly, there was no need for the Director first to have adopted a formal regulation or otherwise comply with the Administrative Procedure Act.

The Appellate Division reversed, holding that the Legislature intended to include SHL property in the property fraction. 12 *N.J.Tax* 255.

We granted certification, 127 *N.J.* 551, 606 *A.*2d 364 (1991).

### III

Like most states, New Jersey imposes a franchise tax on corporations doing business in the state under the New Jersey Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40 (the CBT Act). A corporation must pay that tax "for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State." *N.J.S.A.* 54:10A–2.

During the tax years at issue, the Director computed the amount of CBT by reference to a corporation's entire net income and entire net worth. *N.J.S.A.* 54:10A–5. (Since the tax years at issue, the Legislature has enacted a phase-out repeal of the net-worth provision of the CBT Act. *L.* 1982, *c.* 55. The tax on net worth has been completely eliminated with respect to periods beginning after June 30, 1986). The CBT Act defines entire net income as the "total net income from all sources" that the taxpayer is required to report for federal-income-tax purposes, with certain exceptions. *N.J.S.A.* 54:10A–4(k). Entire net worth is essentially "the present value of the investment in the corporation." *Werner Mach. v. Director, Div. of Tax.,* 17 *N.J.* 121, 124, 110 *A.*2d 89 (1954).

When a taxpayer corporation, like Donnelley, maintains a regular place of business outside this state, New Jersey taxes only that portion of the taxpayer's net income and net worth that is fairly attributable to its corporate activity in the state. To determine the proper apportionment, New Jersey, like forty-five other states, employs an allocation formula that factors in a corporation's receipts, payroll, and property, both within and outside the state. *Silent Hoist & Crane v. Director, Div. of*

*Tax.*, 100 *N.J.* 1, 7, 494 *A.*2d 775, *cert. denied*, 474 *U.S.* 995, 106 *S.Ct.* 409, 88 *L.Ed.*2d 359 (1985); *see also Metromedia v. Director, Div. of Tax.*, 97 *N.J.* 313, 322, 478 *A.*2d 742 (1984) (allocation formula ensures that tax liability reflects only those portions of entire net worth and income fairly attributable to corporation's activities in New Jersey). Each of those three factors is expressed as a fraction, the numerator of which is, respectively, the corporation's New Jersey property, receipts, and payroll, and the denominator of which is the corporation's total property, receipts, and payroll generated by the operation of the entire enterprise. *N.J.S.A.* 54:10A–6(B). Those three fractions are then averaged, and the combined fraction, called the "business-allocation factor," is then applied to the corporation's entire net worth and net income to determine the percentage of net worth and net income properly attributable, and thus taxable, to New Jersey. *N.J.S.A.* 54:10A–6(B).

The "statutory three-ply formula can only approximate the taxpayer's true net worth and income generated by its New Jersey activities." *Metromedia, supra*, 97 *N.J.* at 323, 478 *A.*2d 742. Recognizing that, the Legislature has given the Director broad authority to adjust the business-allocation factor in order to reflect more accurately a taxpayer's New Jersey business activities. The Director has the authority to make adjustments "calculated to effect a fair and proper allocation of the entire net income and entire net worth reasonably attributable to the State." *N.J.S.A.* 54:10A–8(e); *see also Metromedia, supra*, 97 *N.J.* at 323, 478 *A.*2d 742 (Director has broad discretion to reach an amount of taxable income that is fair and proper). *N.J.S.A.* 54:10A–8(d) also specifically permits the Director to exclude one or more assets from the formula or from the entire net worth tax base.

IV

Because the CBT Act uses federal-taxable income as the starting point to determine a corporation's entire net income,

*N.J.S.A.* 54:10A–4(k), ERTA's allowance of safe-harbor leases and accelerated depreciation would have resulted in significant revenue loss to New Jersey. To avoid that loss, the Legislature in 1982 amended the CBT Act.

The Legislature first amended the CBT Act's definition of "entire net income" to read:

(1) Entire net income shall exclude for the periods set forth in paragraph (2)(F)(i) of this subsection, any amount * * * which is included in a taxpayer's federal taxable income solely as a result of an election made pursuant to the provisions of [*I.R.C.* § 168(f)(8) (safe harbor lease provision)].

[*N.J.S.A.* 54:10A–4(k)(1).]

(2) Entire net income shall be determined without the exclusion, deduction or credit of:

(F)(i) The amount by which *depreciation* * * * exceeds the amount of *depreciation* determined in accordance with the Internal Revenue Code provisions in effect prior to January 1, 1981, but only with respect to a taxpayer's accounting period ending after December 31, 1981;

(ii) For the periods set forth in subparagraph (F)(i) of this subsection, any amount, * * * which the taxpayer claimed as a *deduction* in computing federal income tax pursuant to a qualified lease agreement under [*I.R.C.* § 168(f)(8)].

The director shall promulgate rules and regulations necessary to carry out the provisions of this section * * *.

[*N.J.S.A.* 54:10A–4(k)(2)(F)(i), and –4(k)(2)(F)(ii) (emphasis added).]

The Legislature also amended *N.J.S.A.* 54:10A–6(A), which defines the property fraction of the business-allocation factor, by adding the following underscored language:

(A) The average value of the taxpayer's real and tangible personal property within the State during the period covered by its report divided by the average value of all the taxpayer's real and tangible personal property wherever situated during such period; *provided, however, that for the purpose of determining average value, the provisions with respect to depreciation as set forth in paragraph 2(F) of subsection (k) of section 4 of P.L.1945, c. 162 (C. 54:10A–4) shall be taken into account for arriving at such value.*

## V

■ That the Legislature in the 1982 CBT amendments excluded SHL transactions for purposes of determining net income and the receipts fraction of the allocation formula is

undisputed. However, Donnelley maintains that the Legislature did not intend to exclude SHL property from the property fraction. Donnelley contends that the Legislature did not intend to uncouple all state- and federal-tax consequences of SHL property, but intended that a nominal owner of SHL property would be deemed the owner of such property for purposes of computing its property fraction under the CBT Act.

Donnelley relies primarily on its interpretation of *N.J.S.A.* 54:10A–6(A) to support its position. Both parties agree that the reference to *depreciation* set forth in 6(A) is to subsection (F)(i), which requires the addback to the income base of any excess depreciation permitted under the ACRS. However, Donnelley also contends that section 6(A) also refers to (2)(F)(ii), which denies all *deductions* related to SHL property. In doing so, Donnelley interprets "deductions" to mean standard-depreciation deductions. Thus, under Donnelley's view, section 6(A) indicates that a corporation may include the value of SHL property in the property fraction, as long as the corporation does not adjust that value to reflect excess or standard depreciation.

■ We do not find the term "deduction" in (F)(ii) to be synonymous with the term "depreciation." Deductions are not only for depreciation but also for costs such as interest expenses, rent, and transactional expenses. In using "deduction" in (F)(ii), the Legislature did not mean "depreciation." The language in 6(A) therefore more properly refers to (2)(F)(i), which uses the word "depreciation" directly.

Arguably, the Legislature could have made section 6(A) refer specifically to subparagraph (2)(F)(i). It also could have expressly stated that SHL property was not "property" for the purposes of calculating the property fraction. But what Donnelley fails to recognize is that the Legislature's failure to mention SHL deductions in section 6(A) does not imply that corporations can include SHL property in the property fraction. Rather the Legislature had no need to address SHL deductions

because SHL property cannot be included in the property fraction at all.

In construing a statute the court's primary task is to "effectuate the legislative intent in light of the language used and the objectives sought to be achieved." *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980)). "[T]he Court fulfills its role by construing a statute in a fashion consistent with the statutory context in which it appears." *Waterfront Comm'n v. Mercedes–Benz,* 99 *N.J.* 402, 414, 493 *A.*2d 504 (1985). In construing legislation "every effort should be made to harmonize the law relating to the same subject matter." *Superior Air Prods. Co. v. NL Indus.,* 216 *N.J.Super.* 46, 63–64, 522 *A.*2d 1025 (App.Div.1987). Donnelley's interpretation of the statute is inconsistent not only with the Legislature's intent "but also with the entire statutory scheme of which it is a part." *Kimmelman v. Henkels & McCoy,* 108 *N.J.* 123, 129, 527 *A.*2d 1368 (1987).

The 1982 CBT amendments, as well as the CBT Act's apportionment scheme in which only property owned by a corporation and owned not just for its tax benefits may be included in the property fraction, demonstrate that the Director properly excluded Donnelley's SHL property from the property fraction. Such an interpretation leads to a logical reading of the statute and a consistent and sensible policy given the Legislature's intent in enacting the 1982 CBT amendments.

The Legislature passed the 1982 amendments to prevent New Jersey from losing tax revenue because of ERTA. That to achieve that goal the Legislature excluded from the calculation of the CBT receipts and depreciation associated with safe-harbor leases is undisputed. Having done all those things, the Legislature surely did not intend to eliminate fully all effects of ERTA. The tax court correctly observed that if the receipts from safe-harbor leases are considered to have no economic significance, and are thus excluded from income, to "permit the

very property giving rise to the excluded income to be included in the property fraction * * * does not make sense * * *." 11 *N.J.Tax* 241, 252 (1990).

■ Exclusion of SHL property is more sensible in light of the fact that the CBT Act permits a corporation to include only its "real and tangible personal property" in the property fraction. *N.J.S.A.* 54:10A–6(A). *N.J.A.C.* 18:7–8.4(a) states that tangible personal property does not include money, deposits in banks, shares of stock, bonds, notes, credits, evidence of an interest in property, or evidence of debt. Similarly, tax benefits obtained through safe-harbor leases do not constitute "real and tangible personal property." Tax benefits are intangible rights. Unlike ERTA, the CBT Act requires that a corporation must actually own the property in order to include it in the allocation fraction. Accordingly, Donnelley, as the nominal owner of SHL property, may not include that property in the allocation fraction.

Nothing in ERTA authorizing the use of safe-harbor leases indicates that such transactions actually transfer ownership in the property. Indeed, ERTA clearly states the opposite: The incidents, benefits and burdens of ownership rest with the lessee, and all that is actually sold is the tax benefit associated with the property. Congress simply used the form of a lease as a conduit to transfer the tax benefits. As previously stated, traditional tax jurisprudence emphasizes the economic substance or purpose of the transaction and would not characterize SHL transactions as transferring ownership of property. *See Silent Hoist & Crane, supra,* 100 *N.J.* at 6, 494 *A.*2d 775 (taxes should reflect economic reality of transactions).

Donnelley's contract with the lessee of the SHL property confirms that the purpose of the sale-leaseback transaction was to take advantage of the beneficial federal-income-tax consequences. The contract states:

Lessee desires to sell such part (and only such part) of its ownership interest in the Equipment to Lessor [Donnelley] as is necessary to transfer to Lessor

ownership of the Equipment *for Federal income tax purposes* and only for such purposes (such ownership being hereinafter referred to as "Tax Ownership") * * *.

The transaction was a classic safe-harbor lease in that it constituted a lease only because the parties characterized it as such. Donnelley's lease agreement expressly states:

Lessor and Lessee agree that, although Lessor is the holder of Tax Ownership and is considered to be the owner of the Equipment for Federal tax purposes * * * Lessee is, and shall be deemed to be, the owner of the Equipment for all other purposes, and Lessee shall have all such incidents of ownership (other than the right to be treated as the owner for Federal income tax purposes), including * * * the exclusive right to possess, control, repair and use the Equipment without interference by Lessor * * *. [L]egal title in and to the Equipment, and the burdens, benefits and other incidents of ownership inherent therein, shall not be acquired or retained by the Lessor * * *.

The non-economic nature of the transaction is further illustrated by the fact that it is the seller-lessee, and not Donnelley, that reports the SHL property on its books. See *N.J.A.C.* 18:7-5.2(a)(11)(i) (recognizing that "user/lessee" is owner of equipment under SHL). Donnelley, the buyer-lessor, does not report the property as an asset on its books because it has acquired only the property's tax benefits, not the property itself. The value of SHL property is therefore not included in the net worth of a nominal owner such as Donnelley, because *N.J.S.A.* 54:10A–4(d) defines "net worth" as the "aggregate of the value disclosed by the books of the corporation." Similarly, *N.J.A.C.* 18:7–8.5 reflects the Director's longstanding policy to use book value in the property fraction. It provides that "the average values used in determining the property fraction of the allocation factor [shall] be based on book value."

The basic rationale for using the property fraction to determine the amount of business a corporation does in a state is that the state provides a site for the wealth-creating aspects of its multi-state business. *Brunswick v. Division of Taxation,* 11 *N.J.Tax* 530, 539 (1991). Donnelley does not use its SHL property in its business. Indeed, only because the corporation does not have an extensive manufacturing plant that needs new equipment is Donnelley a lessor of SHL property. Because

Donnelley does not own SHL property for the purpose of creating wealth, inclusion of that property in the allocation fraction would undermine the fraction's purpose.

A fair and sensible reading of the 1982 CBT amendments demonstrates that the Legislature intended to uncouple completely New Jersey's tax treatment of SHLs from their federal-tax treatment. That conclusion conforms to the CBT Act's permitting only property actually owned by a taxpayer to be included in the property fraction. We therefore conclude that the Director properly excluded Donnelley's SHL property from the property fraction.

## VI

We also hold that the Director's assessment was not invalid for want of an authorizing rule or regulation. Donnelley alleges that prior to the 1982 CBT amendments, *N.J.A.C.* 18:7–8.1 reflected the Director's position on the property fraction. That regulation provides in relevant part:

(a) The business allocation factor is computed on the basis of the average percentage resulting from the following three fractions:

1. Average value of real and tangible personal property in New Jersey over the average value of such property both within and without New Jersey (this is usually referred to as the property fraction).

The Director never modified that regulation after the Legislature had amended the CBT Act in 1982. Donnelley therefore asserts that the Director's exclusion of its SHL property from the property fraction contradicted an existing regulation. According to Donnelley, the Director's act thus constituted rulemaking that required compliance with the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15 (APA). Donnelley alleges that the Director's actions possessed all characteristics of administrative rulemaking enunciated in *Metromedia, supra*, 97 *N.J.* at 331, 478 *A.2d* 742.

The Tax Court correctly found that no rule or regulation was necessary for the following reasons: first, that the change in the Director's position was specifically dictated by the 1982

amendments; second, that *N.J.A.C.* 18:7–8.1 was not a "definitional regulation" but merely an instruction on the manner in which the property fraction was to be computed; and last and most important, the Director's conclusion that SHL property should be excluded from the property fraction was "plainly inferable" from the 1982 CBT amendments. 11 *N.J.Tax* at 258.

We agree with the Tax Court that the Director's decision to delete the corporation's SHL property from the allocation fraction did not constitute administrative rule-making within the meaning of the APA. "Resolution of this issue involves consideration of the nature of a 'rule' as it affects administrative agency policy-making and regulation." *Metromedia, supra,* 97 *N.J.* at 328, 478 *A.*2d 742. *N.J.S.A.* 52:14B–2(e) defines an administrative rule as "each agency statement of general applicability and continuing effect that implements or interprets law or policy * * *." This Court has held that an agency determination must be considered an administrative rule if, in many or most of the following circumstances, the agency determination

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742.]

The Director's determination meets only factors one and two of the *Metromedia* test. Those two factors alone are insufficient to make the Director's action subject to the APA. The third factor is not met because the Director's action properly applies retroactively to this case and all other similar cases. Factor four also is inapplicable. The 1982 amendments make the Director's determination obviously inferable.

Because the Director's decision is not at odds with past policy, it also does not meet factor five. The Director has followed a policy of assessing ownership for tax purposes based on the real economic character of the transaction since the Legislature first enacted the CBT Act in 1946. We recognize that the Director permitted Donnelley Corporation to include its SHL property in the allocation fraction in 1981, the year in which Congress passed ERTA. However, *N.J.S.A.* 54:10A–4(k)(2)(F)(ii) specified that the amendments were to apply only to tax years after 1981. Following that statutory directive the Director properly allowed Donnelley to include its SHL property in its 1981 allocation fraction.

The sixth and final factor does not apply because the Director's decision was not on administrative regulatory policy but on the statute itself.

The Legislature's 1982 amendments to the CBT Act reaffirmed the Director's long-standing policy that lease transactions that do not transfer property with all of its incidents, benefits, and burdens do not transfer ownership of that property. By excluding Donnelley's SHL property, the Director followed both the statute and its own "clear past * * * position on the identical subject matter." *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742. The Director's action did not, therefore, constitute a rule necessitating compliance with the APA.

## VII

We reverse the judgment of the Appellate Division and reinstate the judgment of the Tax Court.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.