609 A.2d 1236
IN THE MATTER OF THE DEPARTMENT OF INSURANCE'S
ORDER NOS. A89–119 AND A90–125 AND THE
ADOPTION OF N.J.A.C. 11:3–16A.

Argued May 4, 1992—Decided July 29, 1992.

*Joseph L. Yannotti,* Assistant Attorney General, argued the cause for appellant Department of Insurance (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti* and *Donald Parisi,* Deputy Attorney General, on the briefs).

*Thomas P. Weidner* argued the cause for respondent State Farm Mutual Auto Insurance Co. (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Thomas P. Weidner* and *Deborah T. Poritz,* of counsel; *Thomas P. Weidner, Deborah T. Poritz,* and *Arthur F. Herrmann,* on the briefs).

The opinion of the Court was delivered by

O'HERN, J.

■ The central issue in this appeal is whether the Legislature intended, through its "flex-rate" provisions, to allow insurers to implement, without prior approval, a minimum annual increase of three percent in private-passenger automobile-insurance rates as an incentive to the restructuring of the automobile-insurance market. The flex-rate provisions, *N.J.S.A.* 17:29A–44, set a statutory cap on the "Statewide average rate change," beyond which rates cannot automatically increase without prior approval from the Commissioner of Insurance

(the Commissioner). The shorthand version of that law is that insurers may increase insurance rates not more than the last published increase in the relevant national Consumer Price Index (CPI), plus three percentage points.

The interpretive issue is whether the proviso that allows the Commissioner to modify the Statewide average rate change whenever "either or both of the published [CPI] indices will produce rate levels which are excessive," *N.J.S.A.* 17:29A–44d, allows the Commissioner to modify, as well, the three percentage-point rate increase. Were the flex-rate provisions read in isolation, we could well agree with the Commissioner that the statute might allow suspension of the three percentage points. However, when the statute is read in conjunction with the related changes in the private-passenger automobile-insurance industry, *i.e.*, the optional verbal threshold, mandatory depopulation of the assigned-risk pool, and the subsequent reliance on the flex-rate provisions to sustain the constitutionality of the Fair Automobile Insurance Reform Act, *L.* 1990, *c.* 8 (the FAIR Act), the totality compels the conclusion that the three-percent flex-rate increase is an integral part of the comprehensive automobile-insurance reform that cannot be modified by the Commissioner.

I

For purposes of this appeal, we adopt generally the statement of the case as set forth in the State's petition for certification. At issue are administrative orders entered in 1989 and 1990 by the Commissioner that set forth the amounts by which private-passenger automobile insurers in the voluntary market may increase their rates under the flex-rate statute, *N.J.S.A.* 17:29A–44.

On May 12, 1989, the Commissioner issued Administrative Order A89–119, which prescribed the maximum flex-rate increases that could be implemented by insurers on or after July 1, 1989. In that Order, the Commissioner noted two categories

of coverage—bodily injury and physical damage—for which the implementation of flex-rate increases would result in excessive rates. With respect to bodily-injury coverage, the Commissioner noted that under *N.J.S.A.* 39:6A-8 insureds have the option to choose one of two types of coverage. Insureds may elect to pay a lower premium for a policy with a verbal threshold that restricts the ability to sue for non-economic loss, or they may select a more costly, zero-threshold policy that allows an unrestricted right to sue for non-economic losses. See *N.J.S.A.* 39:6A-8. The Commissioner believed that if insurers were permitted to implement a flex-rate increase for bodily-injury coverage with both verbal and zero thresholds, the increases would result in excessive rates.

With respect to physical-damage coverage, the Commissioner noted that all insurers use vehicle series/symbol group rating systems, and that most insurers also use model/year rating systems when calculating physical-damage premiums. Such rating systems, according to the Commissioner, provide built-in increases to physical-damage premiums each year. Were the insurers permitted flex-rate increases in physical-damage coverage, those who use vehicle series/symbol group rating systems alone or along with model/year systems would have rates that are excessive.

Taking those factors into consideration, the Commissioner prescribed the following maximum flex rates for 1989:

| | | |
|---|---|---|
| (1) | Personal Injury Protection | 9.8% |
| (2) | Bodily Injury (verbal threshold) | 4.9% |
| (3) | Bodily Injury (zero threshold) | 9.8% |
| (4) | Property Damage | 9.8% |
| (5) | Physical Damage (with model/year ratings) | 0.0% |
| (6) | Physical Damage (without model/year ratings) | 2.6% |

State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (State Farm) filed a notice of

appeal that challenged the Commissioner's 1989 order, and included among its challenges the fact that the Commissioner lacked adequate regulations to prescribe the methodology for determining permissible flex-rate increases.

Hence, on February 15, 1990, the Commissioner responded by adopting flex-rate regulations that set forth his methodology and reasoning. See *N.J.A.C.* 11:3–16A.1 to –16A.4 as adopted and published at 22 *N.J.R.* 963 (eff. Mar. 19, 1990). The Commissioner reasoned that because the verbal threshold had been entirely new to New Jersey, the relative flex rates for bodily-injury coverage may be based on trends in other states. The regulations also described the Commissioner's theory on modification of the flex rate for physical-damage coverage. The Commissioner stated that because existing approved rates allow for changes to reflect the model/year differential, insurers have automatically built-in increases in the physical-damage component of their rates. Thus, according to the Commissioner, to allow the additional annual three-percent increase would result in excessive rates. State Farm filed an amended notice of appeal on March 30, 1990, incorporating a challenge to those flex-rate regulations.

The Commissioner promulgated a second Administrative Order, A90–125, on May 24, 1990, which established the following maximum flex rates for 1990:

| | | |
|---|---|---|
| (1) | Personal Injury Protection | 11% |
| (2) | Bodily Injury (verbal threshold) | 5.5% |
| (3) | Bodily Injury (zero threshold) | 11% |
| (4) | Property Damage | 11% |
| (5) | Physical Damage (with model/year ratings) | 0.0% |
| (6) | Physical Damage (without model/year ratings) | 1% |

Because loss-trend data continued to show that losses on verbal-threshold policies were one-half as great as losses on zero-threshold policies, the Commissioner had set the maximum flex

rate for bodily-injury (verbal threshold) coverage (5.5%) at one-half of the maximum flex rate for bodily injury (zero threshold) coverage (11%). The Commissioner did not increase the maximum flex rate for physical-damage coverage (with model/year ratings), and set the maximum flex rates for physical-damage coverage (without model/year ratings) at 1% because he had found that the built-in premium increases for physical-damage coverage provided adequate protection against inflation for 1990. State Farm filed a second amended notice of appeal on June 26, 1990, challenging as well the Commissioner's 1990 flex-rate order.

State Farm presented three arguments before the Appellate Division: (1) that the Commissioner is authorized by statute to establish only two flex rates: one for personal-injury protection, residual bodily-injury and property-damage coverage, and one for physical-damage coverage; (2) that the Commissioner does not have the authority to modify the flex rate below three percentage points; and (3) that the Commissioner's 1989 and 1990 flex-rate orders are "devoid of any factual basis."

The Appellate Division, in an unreported *per curiam* opinion, sustained the Commissioner's use of six different categories of flex-rate increases, as set forth in *N.J.A.C.* 11:3–16A.4, but held that the Commissioner lacked the power to reduce the maximum flex rate below three percentage points. The court reasoned that although the Commissioner had the authority to modify the Statewide average rate change, the statute limited his actions to modify increases in the "published indices" that would produce excessive rate levels. The court interpreted the statutory language to permit the Commissioner to reduce only the CPI portion of the flex rate, and not the additional three percentage points. The Appellate Division concluded that to allow the Commissioner to reduce the flex rates below three percent would circumvent the statute's clear language and would, in effect, "penalize insurance companies for the results of inflation."

The court ruled further that the administrative orders setting the flex rates for 1989 and 1990 were unenforceable in their entirety because they had not been supported by substantial evidence and had not been adopted in accordance with the notice and comment procedures required by the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15 (APA). The court therefore remanded the 1989 and 1990 flex-rate orders to the Commissioner to follow the notice and comment procedures required by the APA.

We granted the Commissioner's petition for certification, 127 *N.J.* 565, 606 *A.*2d 376 (1992),[1] and now affirm in part and reverse in part.

## II

To put the issues in perspective, we must first step back to get a broad view of the status of automobile-insurance reform in New Jersey. For that purpose, we generally draw on portions of our recent decision in *State Farm Mutual Automobile Insurance Co. v. State*, 124 *N.J.* 32, 590 *A.*2d 191 (1991), and the observations contained in the Commissioner's March 24, 1992 Decision and Order concerning rate filing by the Market Transition Facility of New Jersey.

Since 1972, our State has required that New Jersey automobile owners purchase automobile-liability insurance coverage to protect the public from the personal and financial injury that may result from operation of their vehicles. *N.J.S.A.* 39:6A–3. As in all of the other forty or so states that require compulsory automobile-liability insurance, a system must exist to provide coverage for those persons who cannot obtain insurance coverage from private insurers. Those residual-market mechanisms

---

[1]State Farm had filed a cross petition for certification challenging the Commissioner's authority to set flex rates for subdivisions and sublines of the two flex-rate categories specified at *N.J.S.A.* 17:29A–44a(1) and (2), but later withdrew its cross petition.

generally take one of three forms: an assigned-risk plan, a Joint Underwriting Association, or a reinsurance facility operated by the State.

When the Legislature enacted compulsory automobile insurance in 1972, New Jersey established an Assigned Risk Plan, *N.J.S.A.* 17:29D-1, which apportioned high-risk drivers among all automobile insurers conducting business in the state. In 1983, however, the Automobile Full Insurance Availability Act, *N.J.S.A.* 17:30E-1 to -24, replaced the assigned-risk system with the New Jersey Automobile Full Insurance Underwriting Association (the Joint Underwriting Association or JUA), which required that all insurers licensed to write insurance in the state become members of the JUA. Although the JUA insured high-risk drivers, it was required to charge voluntary-market rates. The JUA premium income was to be supplemented by Department of Motor Vehicle surcharges, *i.e.*, additional amounts paid by insureds whose driving records had resulted in paid claims and a portion of the money collected from drivers with an accumulation of motor-vehicle points. Any additional money required to pay claims and expenses was to be assessed directly to all automobile-insurance policyholders by policy "flat charges" and "residual market equalization charges" (RMECs). *N.J.S.A.* 17:30E-8. Neither the insurers that acted as servicing carriers nor automobile insurers as a group were liable for the losses paid on policies issued by the JUA. By 1988, over fifty percent of New Jersey drivers had to be insured through the JUA. Claims against the JUA insureds were sizable and greatly exceeded the JUA's available income. The imposition of substantial RMECs was devastating.

Thus, automobile-insurance reform had become an increasingly-important item on the legislative agenda. Reducing the portion of the market insured by the JUA, or the "depopulation" of the residual market, had been identified by the Legislature as a crucial step toward stabilizing the automobile-insurance market. Those legislative concerns resulted in the enact-

ment of the Automobile Insurance Reform Act of 1988. *L.* 1988, *c.* 119 (Reform Act).

On September 8, 1988, Governor Thomas H. Kean signed the Automobile Insurance Reform proposal, whose major provisions included the creation of a no-fault verbal-threshold option, a mandated decrease in the JUA population over four years, increased rates in the JUA, and the creation of flex rating. In his message to the Legislature with respect to the Reform Act, Governor Kean stated that

> [a]utomobile insurance has been a top priority of mine for years. It is a subject which, although endlessly debated, has eluded resolution. The recommendations which follow are the product of lengthy negotiations between the leadership of the Senate and the Assembly. These negotiations resulted in a compromise agreement between the parties *on all the important issues.* [*Governor's Reconsideration and Recommendation Statement,* Senate No. 2637, *L.* 1988, *c.* 119 (emphasis added).]

The Governor stated further that he was pleased that an agreement could be reached with regard to JUA reform, noting that the bill had provided for depopulation of the JUA over a four-year period. The Governor emphasized that

> [t]he bill * * * gives the [insurance] industry rate flexibility as an *incentive* to *depopulate* the *JUA* and *as a mechanism to promote competition* in the industry. The bill is tied to a tough Excess Profits Law * * *; this [Excess Profits Law] will ensure that the industry does not abuse this rate-making flexibility and that any rate increase is justified. [*Ibid.* (emphasis added).]

The Reform Act authorized the Commissioner to establish mandatory depopulation quotas in an attempt to reduce the number of drivers insured by the State. Combined with the plans for depopulation of the JUA was the enactment of the optional verbal-threshold provision, *N.J.S.A.* 39:6A-8. That option had been a long-sought industry goal designed to relieve the industry of frivolous litigation and to enable it to afford policyholders a substantial reduction in premiums.

The flex-rate system was enacted to serve three purposes: (1) to accomplish the depopulation of the JUA; (2) to encourage competition within the insurance industry; and (3) to address the needs of the private-passenger automobile voluntary market. *L.* 1988, *c.* 119, § 29, 1988 *N.J. Sess. Law Serv.* at 658

(codified at *N.J.S.A.* 17:29A–42 (repealed)). As originally enacted, the flex-rate provision provided the Commissioner with absolute discretion to establish annually the "Statewide average rate change" percentage for use by filers, "with due recognition to changes in the Consumer Price Indices most relevant to changes in the cost of automobile insurance." *L.* 1988, *c.* 119, § 29. By a subsequent amendment, the Legislature reversed the order of initiative with respect to the flex rate and provided that the maximum annual rate increase shall be not more than the national CPI increase plus three percent, unless the Commissioner should take affirmative action, the extent of that being the subject of this controversy. *L.* 1988, *c.* 156, § 5 (codified at *N.J.S.A.* 17:29A–44).

The FAIR Act of 1990 went beyond the 1988 Reform Act in several respects. *L.* 1990, *c.* 8. (codified at *N.J.S.A.* 17:33B–1 to –63). The FAIR Act's legislative findings and declaration included the following statement regarding the residual market:

> It has become increasingly obvious to the Legislature and the public that * * * one of the principal goals * * * has not been attained: economy. Not only has the cost of the insurance product itself escalated, but the subsidies that most drivers contribute to support the financially-troubled New Jersey Automobile Full Insurance Underwriting Association have made the system a burden, rather than a benefit, to the citizens of the State. [*N.J.S.A.* 17:33B–2d.]

Thus, the primary goals of that Act were (1) to lower insurance premiums for most New Jersey drivers, (2) to depopulate the JUA by reintegrating insureds into the voluntary market, and (3) to develop a funding mechanism to pay the more than $3.3 billion JUA debt. *State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191. In essence, the Act proposed to phase-out the JUA by the creation of a Market Transition Facility that would transform the New Jersey automobile-insurance residual market into a (revived) Assigned Risk Plan. The FAIR Act contemplates that the residual market will include no more than ten percent of the total personal-automobile insurance market.

### III

With that background, we turn to the specific provisions of the amended legislation.

17:29A–44.  **Maximum rates**

a.  Beginning July 1, 1989, a filer may charge rates for private passenger automobile insurance in the voluntary market which are not in excess of the following:

(1) For private passenger automobile personal injury protection coverage, residual bodily injury and property damage insurance, the maximum permissible annual rate increase applicable to each rate level utilized by an insurer in the voluntary market pursuant to section 6 of P.L.1988, c. 156 (C.17:29A–45) shall be a Statewide average rate change of not more than the last published increase in the medical care services components of the national Consumer Price Index, all urban consumers, U.S. city average, plus three percentage points.

(2) For private passenger automobile physical damage coverage, the maximum permissible annual rate increase applicable to each rate level utilized by an insurer in the voluntary market pursuant to section 6 of P.L.1988, c. 156 (C.17:29A–45) shall be a Statewide average rate change of not more than the last published increase in the automobile maintenance and repair components of the national Consumer Price Index, U.S. city average, plus three percentage points.

b.  For the purposes of this section, "Statewide average rate change" means the total Statewide premium for all coverages combined at the rates in effect at the time of the filing for each rate level.

c.  Any change in excess of the rate changes permitted by paragraphs (1) and (2) of subsection a. shall be subject to the provisions of P.L.1944, c. 27 (C.17:29A–1 et seq.).

d.  If, at any time, the commissioner believes that an increase in either or both of the published indices will produce rate levels which are excessive, he may modify the Statewide average rate change which may be used pursuant to this section.

Those flex-rate increases are expressly exempt from the statutory provisions governing formal rate-increase applications, which require the Commissioner's prior approval. See *N.J.S.A.* 17:29A–44e. The Commissioner is authorized to establish the format and content requirements for that informational filing. *Ibid.* As *N.J.S.A.* 17:29A–44 had originally been enacted in 1988, no obligation had been imposed on the insurer to notify the Public Advocate of its decision to avail itself of a flex-rate increase. The FAIR Act, however, requires insurers to notify the Public Advocate's Division of Rate Counsel when seeking a flex-rate increase and permits the Public Advocate thirty days in which to challenge flex-rate increases. *N.J.S.A.* 17:29A–44f.

The State argues that we must focus on the meaning of the "Statewide average rate change." It emphasizes that the grammatical structure of the flex-rate provisions allows the Commissioner to modify not only the CPI increase but also the three-percentage-point increase. *N.J.S.A.* 17:29A–44b defines "Statewide average rate change" as "the *total* Statewide premium for all coverages combined at the rates in effect at the time of the filing for each rate level." (Emphasis added). The State thus argues that "Statewide average rate change" has two components: the first is a change in the CPI, and the second is the three-percentage-point increase. The sum of those two figures is the Statewide average rate change that the Commissioner may modify.

The State argues that the Appellate Division thus erroneously reasoned that the Commissioner could modify only one component of the composite Statewide average rate change. In the State's view, the plain language of *N.J.S.A.* 17:29A–44d empowers the Commissioner to modify the "Statewide average rate change," *i.e.,* both the CPI and the three-percent increase. In addition, the State argues that to conclude that the Act would include a provision that grants a guaranteed annual three-percent increase to insurers when the rest of the Chapter is replete with mandates to the Commissioner not to permit excessive rates would be illogical. *N.J.S.A.* 17:29A–4, for example, requires that rates not be unreasonably high. *N.J.S.A.* 17:29A–5.6 to –5.16, New Jersey's Excess Profits Law, mandates refunds to policyholders should rates produce excessive profits for insurers. *N.J.S.A.* 17:29A–7 authorizes the Commissioner to reduce unreasonably-high or excessive rates. *N.J.S.A.* 17:29A–9 provides for hearings to reduce rates when any person affected by the rate submits an application for a reduction. The Commissioner asserts that when read in its entirety, the true meaning and intention of the flex-rate provision compels a conclusion that the Legislature did not intend to grant a guaranteed annual three-percent increase to insurers.

The difficulty with that argument is that it fails to take into account the goals that the Legislature intended to achieve when enacting the flex-rate provisions. As noted, flex-rating is part of a broad mosaic of continual change in the automobile-insurance rating systems. We cannot help but believe that to return, in essence, to a system of pre-filing will undermine those incentives to depopulate the JUA and the efforts to promote competition in the industry.

The Legislature wants to see if the market will work. If, as the State argues, the use of flex rates will inevitably produce excessive profits for the industry, by definition the industry should start competing within itself. Insurers that are making a profit without the three-percent increase might believe that they can gather a more significant portion of the market in that way. If market forces do not work, the Commissioner has the power to act.

In addition, we must confront the fact that the State has placed significant emphasis on the availability of flex rating to sustain the FAIR Act. In *State Farm, supra,* 124 *N.J.* 32, 590 *A.*2d 191, we reviewed the constitutional validity of that legislation. We noted there that the State confronts the problem of how to pay off the JUA's prior accumulated debt of over $3.3 billion. *Id.* at 43, 590 *A.*2d 191. That Act imposed surtaxes and assessments on insurers' premiums. Because the FAIR Act directed the Commissioner to take such action as he deemed necessary to ensure that policyholders did not pay for either the surtaxes or assessments, we had to consider whether the Act facially precluded insurers from earning a fair rate of return. In arguing for an integrated view of automobile-insurance reform, the State pointed out that "carriers can increase their income through available 'flex-rate' increases, which permit insurers to raise rates by amounts related to increases in certain components of the Consumer Price Index without prior regulatory approval." *State Farm, supra,* 124 *N.J.* at 55, 590 *A.*2d 191.

The State thus contended that the Legislature had stopped short of "an absolute prohibition against any form of rate relief for the surtaxes and assessments." *Ibid.* The Attorney General's Appellate Division brief in *State Farm,* later directly certified by this Court, plainly stated that "[i]nsurers are allowed to increase rates whether or not they have experienced an increase in costs equal to that reflected in the CPI. Also, the insurers may add another 3% to the increase without any need to show that an increase is needed." To return to a position lacking in the flexibility recommended by Governor Kean and urged by the State in *State Farm, supra,* 124 *N.J.* at 55, 590 *A.*2d 191, would counter those assumptions.

Even within *N.J.S.A.* 17:29A–44 there are countervailing indicia of legislative intent. Had the Legislature intended that the three-percent increase be subject to modification by the Commissioner, it could easily have provided in section d of that provision that if at any time the Commissioner believes that the *flex-rate increases* would produce rate levels that are excessive, the Commissioner may modify the Statewide average rate change. The Legislature did not do that. The statement that accompanied the bill explained that "if the commissioner believes that the published indices would produce rate levels which are excessive, he may modify the Statewide average rate change *provided by the indices.*" Senate Labor, Indus. and Professions Comm. *A.*3702, *L.*1988, *c.* 156. (Emphasis added). Finally, the current statute, *N.J.S.A.* 17:29A–44, may be seen to have reflected a compromise among three bills that the Legislature had been considering: (1) one proposed bill made the CPI increases plus three percent mandatory, *S.*2637 (3d reprint); (2) one bill made the flex rate entirely discretionary with the Commissioner, *L.*1988, *c.* 119, § 29; and (3) the current provision that makes the CPI increases subject to modification, but not the three percentage points. *L.*1988, *c.* 156, § 5.

To repeat, were we remitted only to the language of *N.J.S.A.* 17:29A–44, we might be inclined to rule that the statute's language could be interpreted in the manner advanced by the

State. However, when "reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted." *New Jersey Builders, Owners and Managers Ass'n v. Blair*, 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972). Recently, in *Reuben H. Donnelley Corp. v. Director, Division of Taxation*, 128 *N.J.* 218, 607 *A.*2d 1281 (1992), we said that

> [i]n construing a statute the court's primary task is to "effectuate the legislative intent in light of the language used and the objectives sought to be achieved." *Merin v. Maglaki*, 126 *N.J.* 430, 435 [599 *A.*2d 1256] (1992) (quoting *State v. Maguire*, 84 *N.J.* 508, 514 [423 *A.*2d 294] (1980). "[T]he Court fulfills its role by construing a statute in a fashion consistent with the statutory context in which it appears." *Waterfront Comm'n v. Mercedes–Benz*, 99 *N.J.* 402, 414 [493 *A.*2d 504] (1985). In construing legislation "every effort should be made to harmonize the law relating to the same subject matter." *Superior Air Prods. Co. v. NL Indus.*, 216 *N.J.Super.* 46, 63–64 [522 *A.*2d 1025] (App.Div.1987). [*Id.* at 227, 607 *A.*2d at 1286.]

As in *Donnelley*, the State's interpretation of the flex-rate provisions is "inconsistent not only with the Legislature's intent 'but also with the entire statutory scheme of which it is part.' " *Ibid.* (quoting *Kimmelman v. Henkels & McCoy*, 108 *N.J.* 123, 129, 527 *A.*2d 1368 (1987)).

Just as we did not read the ban on passthroughs of surtaxes and assessments in a vacuum in *State Farm, supra*, 124 *N.J.* at 61–62, 590 *A.*2d 191, here we may not read the flex-rate provisions in a vacuum. Here, as there, we read the automobile-insurance-industry regulation in its entirety, and we believe that in order to achieve its legislative purposes the Legislature would have intended a minimum degree of flexibility, set at three percent, to encourage depopulation of the JUA and to foster competition in the automobile-insurance industry. Ordinarily, we would be inclined, as is our dissenting member, Justice Handler, to give deference "to the expertise of the Commissioner and his staff," *post* at 389, 609 *A.*2d at 1248, in administering the complexities and intricacies of insurance regulation. We cannot effectively do that here without retracing the steps already taken under an interpretation of the Act that

would appear to be at odds with that now suggested. *See State Farm, supra,* 124 *N.J.* at 55, 590 *A.*2d 191.

## IV

■ The remaining issue concerns whether the Commissioner's procedure for adopting the administrative orders establishing the maximum flex rates complied with the statutory requirements of the APA. The Appellate Division held that the Commissioner's orders were invalid because they had failed to adhere to the notice and comment procedures of the APA, *N.J.S.A.* 52:14B–4, and had failed to "identify the facts and evidence supporting the orders." Although State Farm had never made such an argument to the Appellate Division, it now argues that the Commissioner's administrative orders are "rules" within the statutory definition of the APA, and therefore must comply with the "notice and comment" provisions of *N.J.S.A.* 52:14B–4. That provision essentially requires that prior to the adoption of any rule, the agency shall give at least thirty days' notice of its intended action; provide a summary of the proposed rule, with an opportunity for all interested persons to submit data, views, or arguments, orally or in writing; and a report summarizing the content of such submissions and providing the agency's response to the views and arguments. *N.J.S.A.* 52:14B–4.

Resolution of this issue thus turns on whether the Commissioner's flex-rate orders are "rules" as contemplated by the APA. *N.J.S.A.* 52:14B–2(e) provides:

"Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.

This Court's decision in *Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984), delineates the appropriate test to be applied when determining whether an

agency determination constitutes rule-making, requiring compliance with the APA's notice and comment procedures:

[A]n agency determination must be considered an administrative rule when all or most of the relevant features of the administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [*Id.* at 331–32, 478 *A.*2d 742.]

All of those factors need not be present for an agency determination to constitute rulemaking, and are to be balanced according to weight, not number. *In re Solid Waste Util. Customer Lists*, 106 *N.J.* 508, 518, 524 *A.*2d 386 (1987).

The Commissioner does not deny that the first three *Metromedia* factors are implicated here, but argues that the orders "do no more than implement" the flex-rate regulation. *N.J.A.C.* 11:3–16A. (As originally promulgated, the 1989 order met all six of the *Metromedia* factors, and thus should have complied with the notice and comments procedure set forth in the APA.) However, as noted, the Commissioner adopted *N.J.A.C.* 11:3–16A in response to those concerns. The adoption of that regulation essentially cured the lack of notice and comment for the 1989 order. State Farm's cross-petition with respect to the validity of that regulation has been withdrawn.

We agree with the Commissioner that once the validity of the underlying regulations has been established, annual orders, such as the second Administrative Order, A90–125, essentially calculate the flex rate by applying the standards set forth in the regulations. Thus, such an order does not "prescribe[ ] a legal standard or directive that is not otherwise expressly

provided by or clearly and obviously inferable from the enabling statutory authorization." *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742. Nor does that order meet the remaining two *Metromedia* factors because (1) the agency policy that the order "reflects" had previously been expressed in *N.J.A.C.* 11:3–16A and does not alter the Commissioner's position expressed in that regulation; and (2) the order does not provide an "interpretation of law or general policy." *Id.* at 331–32, 478 *A.*2d 742.

Not every action of an agency, including informal action, need then be subject to the formal notice and comment requirements of *N.J.S.A.* 52:14B–4. The State argues that to require strict compliance with those procedures under the circumstances of the annual orders would be counter-productive because it would drive the CPI data back further into the year in order to allow for the full comment period, and thus would have the effect of implementing stale data. (There is apparently a built-in time lag in publishing notices in the *New Jersey Register* that extends the comment period well beyond the statutory thirty-day provision.) We agree that statutory notice and comment is not required for the annual orders.

However, the fact that that agency action is not subject to the strict requirements of *N.J.S.A.* 52:14B–4 does not mean that no process is required. We evaluated concerns for administrative due process in connection with educational issues in *Board of Education of Plainfield v. Cooperman,* 105 *N.J.* 587, 523 *A.*2d 655 (1987). There, we reviewed an agency's ability to provide informal or flexible procedures for determining certain issues and were satisfied that so long as the parties had adequate notice, a chance to know opposing evidence, and the opportunity to present evidence and argument in response, due process would be fundamentally satisfied. *Id.* at 600–01, 523 *A.*2d 655. The agency may tailor the procedures to the necessities of the circumstances and shorten the comment periods as it deems reasonable. As we understand the time line here, the Commissioner wishes to use February CPI data. He may

inform interested parties of his proposed action in a timely way and afford the parties a shortened opportunity to comment.

We are satisfied that the standard of review adopted by the Appellate Division, *i.e.*, that the orders be supported by substantial evidence, is consistent with our prior rulings. The Commissioner's action here consists not of an entirely discretionary action with respect to the allocation of resources as in *Dougherty v. Department of Human Services*, 91 *N.J.* 1, 7, 449 *A.*2d 1235 (1982), but rather of the application of facts to the law. The Commissioner's action seems more closely analogous to quasi-legislative determinations similar to rate-making. *In re 1976 Hosp. Reimbursement Rate for William B. Kessler Memorial Hosp.*, 78 *N.J.* 564, 577, 397 *A.*2d 656 (1979) (Handler, J., concurring) ("There should be applied the time-tested precepts of judicial review of administrative action, that agency action proceed upon an evidential foundation and that the grounds of decision be fully revealed."). One of the core values of judicial review of administrative action is the furtherance of accountability. Thus, an agency is never free to act on undisclosed evidence that parties have had no opportunity to rebut. *Brotherhood of R.R. Trainmen v. Palmer*, 47 *N.J.* 482, 487, 221 *A.*2d 721 (1966); *see also Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n*, 98 *N.J.* 458, 468, 487 *A.*2d 714 (1985) ("agency must set forth basic findings of fact supported by the evidence and supporting the ultimate conclusions and final determination so that the parties and any reviewing tribunal will know the basis on which the final decision was reached").

The Appellate Division was concerned that the only sources of support for the orders, in effect, were the 1989 and 1990 orders themselves and the documents relating to *N.J.A.C.* 11:3–16A. The court reasoned that it could not fully discern the basis for the Commissioner's action from such orders. See Kenneth C. Davis, *Administrative Law of the Seventies, Supplementing Administrative Law Treatise* § 16.00–6, at 393

(1976) (citing *Phelps Dodge Corp. v. NLRB*, 313 *U.S.* 177, 61 *S.Ct.* 845, 85 *L.Ed.* 1271 (1941)). The Commissioner has since moved to supplement the record with a detailed background and data supporting his determination. We grant that motion in the interest of resolving these matters. We are satisfied that the agency action is based on a sound evidential foundation and that the grounds of decision have been fully revealed, and thus the action taken (aside from the three-percent flex rate) does not constitute a clear abuse of discretion.

In the present posture of the case, the only prudent course, then, is to affirm the Commissioner's 1989 and 1990 orders except to the extent that they would disallow the three-percent flex-rate increase. We specifically decline to address any retroactive or cumulative effect of such a ruling. At a minimum, the Commissioner should first be allowed to address that issue in the regulatory context. Neither he nor the Public Advocate should be deprived of the opportunity to challenge any rate changes implemented pursuant to flex rating either under *N.J.S.A.* 17:29A–44f (Public Advocate may challenge a flex-rate change within thirty days), or under *N.J.S.A.* 17:29A–7 (Commissioner may reduce unreasonably-high or excessive rates by order).

The judgment of the Appellate Division is affirmed in part and reversed in part. The 1989 and 1990 flex-rate orders are upheld except to the extent that they withhold the statutory three-percent flex-rate increase.

HANDLER, J., dissenting.

The central issue in this appeal focuses on the scope of the authority of the Commissioner of the Department of Insurance to modify the statutory flex-rate formula for determining premium-rate increases that insurance carriers can obtain without prior departmental approval. The flex-rate formula is prescribed by *N.J.S.A.* 17:29A–44. The Court acknowledges that the Commissioner does have the authority to modify part of the

formula—the rates can be changed if he determines that the increases in the Consumer Price Index (CPI) component of the formula will produce excessive rate levels. *Ante* at 378, 609 *A*.2d at 1243. However, it holds that in modifying the formula, the Commissioner may modify only the CPI component; the Commissioner may not alter the second part of the formula, which authorizes a flat, three-percent increase.

The critical statutory text that deals expressly with the Commissioner's power to modify the formula does not confine that authority to the CPI component of the formula. *N.J.S.A.* 17:29A–44(d) provides that "if, at any time, the Commissioner believes that an increase in either or both of the published indices will produce rate levels which are excessive, he may modify the *statewide average rate change* which may be used pursuant to this section." (emphasis added).

That the terms of the statute do not restrict departmental change of the flex-rate formula to the CPI component or insulate the flat-percentage component of the formula from any change is rather clear. What may be changed is the "statewide average rate." The Court reaches its conclusion that any change must be limited to the CPI component not so much from the language of the statute as from its perception of the statute's legislative history and its understanding of the legislative purpose. *Ante* at 378, 609 *A*.2d at 1243.

The history of this statutory provision is relatively scant. One sentence in the legislative material surrounding the passage of *N.J.S.A.* 17:29A–44 states that "if the Commissioner believes that the published [CPI] indices would produce rate levels which are excessive, he may modify the Statewide average rate change provided by the indices." Statement to Assembly, No. 3702 (Oct. 20, 1988), In my opinion, nothing in the language of that statement indicates an intent or purpose to limit the Commissioner's ability to modify the statutory formula only to one component of that formula. The statute, confirmed by that legislative history, simply requires the Commissioner to

evaluate in the context of the entire formula whether increases in the CPI components will cause the overall formula to produce excessive rate levels. If the Commissioner makes such a determination, the legislative statement and the statute itself both clearly indicate that the Commissioner may modify the *statewide average rate change* calculated pursuant to the formula. The statewide average rate change based on the formula derives from both the CPI component and the three-percent component. Neither the statute nor the legislative history contains any qualifying language that would tend to limit the Commissioner's discretion to modify the statewide average rate by changing only one element of the statutory formula. Rather, the manner in which the formula is to be modified is left entirely to the sound discretion of the Commissioner.

To explain that the Commissioner can modify the statewide average rate only by changing the CPI component of the formula the Court hypothesizes a legislative history that suggests that the flex-rates are virtually an absolute right and therefore not subject to any modification. The Commissioner's position, says the Court,

fails to take into account the goals that the Legislature had intended to achieve when enacting the flex-rate provisions. As noted, flex-rating is part of a broad mosaic of continual change in the automobile-insurance rating systems. We cannot help but believe that to return, in essence, to a system of pre-filing will undermine those incentives to depopulate the JUA and the efforts to promote competition in the industry. [*Ante* at 377, 609 *A.2d* at 1242.]

The Court acknowledges that excessive rates may occur if no modification of the three percent is permitted. Indeed, it seems to recognize that "the use of flex rate will inevitably produce excessive profits for the industry." *Id.* at 377, 609 *A.2d* at 1242. It nevertheless insists that even though the statute addresses that contingency by empowering the Commissioner to modify the "statewide average rate," that authority itself does not extend to the CPI component and therefore cannot be used to countermand excessiveness resulting from the flex rate. It concludes, wishfully but somewhat inconsistently, that

excessive rates can be overcome or corrected because "the industry should start competing within itself." *Ibid.*

In my opinion, an unconstrained reading of the statute, a reasonable interpretation of its legislative history, and a broad understanding of its purposes confirm the correctness of the State's position. The legislation, when proposed, was discussed at some length before the Senate Labor, Industry and Professions Committee. If one of the Legislature's goals in enacting that bill was to set a minimum three-percent flex-rate increase, or to place the three-percent increase beyond the reach of the Commissioner's ability to modify under *N.J.S.A.* 17:29A–44d, that that proposal did not explicitly enter into any of the discussions seems odd.

Comments in the legislative history concerning limiting the Commissioner's discretion appear to relate more to the determination to eliminate the Commissioner's discretion in setting the initial maximum flex-rate increase than to his ability to modify it below three percent to prevent excessively high rates. Indeed, during the entire hearing only one reference to the reason for setting the flex rate at three percentage points over the CPI surfaced. That reference was made by Commissioner Merin, who stated that the flex rate was set at three percentage points above the relevant CPI components because the drafters felt that the three percent would offset "the tendency of the factors involved in auto insurance to outpace the CPI." Testimony of Commissioner Merin, *Public Hearing* at 17. That testimony would seem to indicate that the three percent was not intended to be separate from the Consumer Price Index, but rather was intended to assure that the flex-rate increases would more effectively match the true increase in the cost of doing business. It does not follow that when the flex-rate increases exceed the true increases in the cost of doing business and, in fact result in excessive rates, they would be immune from adjustment.

The Court seems to have accepted the contention of the insurance industry that a flex-rate increase of three percentage points, standing alone, will never produce an excessive rate level, even though it seems to recognize that it will produce excessive profits. *Ante* at 377, 609 *A.*2d at 1242. It may well be that even without the increases in the CPI components of the formula, an increase of three percent by itself would still produce an excessive rate level. If it does, nothing in the statute or its history insulates that excessive rate from departmental scrutiny and change. Further, the statute as a whole reflects a concern with protecting the consumer from excessive rates. *See, e.g., N.J.S.A.* 17:29A-4 (insurers may not set rates which are "unreasonably high or inadequate for the safety or soundness of the insurer"); *N.J.S.A.* 17:29A-5.6 to 5.16 (defining excess profits over three year period and requiring excess profits be refunded to policyholders by the insurer); *N.J.S.A.* 17:29A-7 (empowering Commissioner to order modification of a filed rating-system if he determines it will produce unreasonably high or inadequately low rates); *N.J.S.A.* 17:29A-9 (giving anyone affected by a rate a right to a hearing before insurer on application to reduce rate, and then Commissioner if application is denied); and *N.J.S.A.* 17:29A-14 (requiring Commissioner to disapprove submitted changes in property and casualty lines that produce rates that are "unreasonable, inadequate, or unfairly discriminatory").

The Court, I submit, fails to appreciate that whether the automatic rate based on the three-percent standard is an excessive one is a highly technical matter calling for the application of the Commissioner's special expertise. We have explained the complexities and intricacies of the Reform Act, which provides the context for the Commissioner's authority to modify the flex rate. *See State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 590 *A.*2d 191 (1991). The statutory scheme assures the Commissioner broad powers to achieve the competing goals of the Reform Act. *Ibid.; see In re: Twin City Fire Ins. Co.,* 129 *N.J.* 389, 609 *A.*2d 1248 (1992). The statute, in my opinion,

leaves to the expertise of the Commissioner and his staff the determination of whether adjustment of the increases produced by the CPI component, the three percentage point component, or both components, is necessary to ensure that the formula does not produce an excessive rate level. Deference should be given to the expertise of the Commissioner and his staff in this regard. *Abbott v. Burke,* 100 *N.J.* 269, 301, 495 *A.2d* 376 (1985); *Bergen Pines Hosp. v. Department of Human Servs.,* 96 *N.J.* 456, 474, 476 *A.2d* 784 (1984); *Emmer v. Merin,* 233 *N.J.Super.* 568, 581, 559 *A.2d* 845 (App.Div.1989).

I would reverse the judgment below.

*For affirmance in part; for reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—Justice HANDLER—1.